NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WINCHESTER ELECTRONICS, INCORPORATED; and Pyne Molding Incorporated, Respondents.

No. 16, Docket 26776.

United States Court of Appeals Second Circuit.

Argued Sept. 29, 1961.

Decided Oct. 24, 1961.

Vivian Asplund National Labor Relations Board, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

W. H. F. Millar, Waynesville, N. C. (William I. Millar, Waynesville, N. C., and Morgan P. Ames, Stamford, Conn., on the brief), for respondents.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

Respondent Winchester Electronics, Inc. (Winchester), manufactures and

distributes electrical connectors and related products. Two of its plants are located at New Milford and Danielson, Connecticut. Respondent Pyne Molding, Inc. (Pyne), manufactures and distributes moldings and related products, shipping a great deal of them to Winchester. Pyne and Winchester, which share the same plant facilities in New Milford and have the same president and vice president, have stipulated that they constitute a single employer.

Early in 1959 the International Brotherhood of Electrical Workers, AFL-CIO (the Union) attempted to organize the plants of both respondents. Although the Board found that Winchester and Pyne threatened their employees with reprisals for union activities in violation of § 8(a)(1) of the National Labor Relations Act, 61 Stat. 136, 140, 29 U.S.C.A. § 158(a)(1) the Union won the three elections on May 21 at Winchester's New Milford and Danielson plants and Pyne's New Milford plant.

During the bargaining over a contract, the Union was represented by Richard Rogers and the respondents by C. S. Connor and W. H. F. Millar. Rogers complained because he had to bargain with two people both of whom needed approval from H. H. Burtt, the president of both respondents, who was in Europe. Consequently, on July 13 and July 15 the employees of both respondents struck. At a meeting on July 16, Connor informed Rogers that he had heard from President Burtt, that Millar was "out of the picture," and in response to Rogers' query whether Connor was authorized to "give us some answers" Connor replied that he was and exhibited a photostat of Burtt's cablegram authorizing Vice President Detar to sign an agreement. Connor and Rogers then came to an agreement on all matters in dispute except wages. There is a conflict over whether Connor told Rogers that he would have to get approval from his principals on only the wage question or on all the issues discussed. The trial examiner who had an opportunity to observe both Connor and Rogers accepted the version that only wages were subject to approval. The next day Connor told Rogers that Burtt, who was still in Europe, had approved the wage settlement and that everything else was as it had been settled the previous night. On Monday, July 20, the strikers returned to work. The provisions of the agreement between Rogers and Connor relating to wage increase, insurance, and shift differentials were immediately put into effect, and with the approval of respondents' supervisory employees a notice containing the agreed upon union-security provisions which began "The contract between the Company and Union provides * * *" was posted on the bulletin board.

But the contract was never signed. Upon his return from Europe Burtt insisted on various changes. Meanwhile, without consulting the Union, Winchester laid off 84 employees and transferred part of the New Milford operations to a new unorganized plant in Oakville, Connecticut. On September 9 the employees at all three plants struck again. However, on November 16, 1959, Rogers notified respondents that all employees were unconditionally available for work. Few strikers have been reinstated.

The trial examiner found that Connor had actual, or at least apparent, authority to negotiate a binding contract, subject to approval on wages. Since this approval was obtained, the trial examiner found that the contract was binding and thus Winchester had violated § 8(a)(1) and (5) of the Act by its repudiation of the contract. The trial examiner viewed the complaint as not alleging that Pyne had refused to bargain but the Board granted the General Counsel's motion to amend the complaints to include Pyne. Consequently, the Board ordered both Winchester and Pyne to sign the contract if requested by the Union. Furthermore, the trial examiner and the Board found that the layoffs and transfer of operations were motivated by discrimination against union members in violation of § 8(a)(3) of the Act. Therefore, since the strike of September

9 had been caused by respondents' unfair labor practices in repudiating the contract and making discriminatory layoffs, the trial examiner and the Board ordered respondents to reinstate their employees with back pay.

■ The respondents argue that the trial examiner's finding that Connor had either actual or apparent authority is not supported by the evidence. However, after Connor had communicated with Burtt and received the latter's approval on a settlement of the wage issue, Connor told Rogers that, conditioned on the men going back to work Monday, everything else was still as they had agreed to it. When the men returned to work, the respondents acted as if a binding contract existed by putting into effect the wage increase, insurance provisions, and shift differentials and by allowing the posting of the agreed upon union-security notice which began with "The contract between the Company and the Union provides * * *" Certainly, in light of the fact that Connor had shown Rogers a photostat of Burtt's cablegram authorizing a company official in the United States to make a binding agreement, the Board's finding that a contract existed was supported by substantial evidence. N. L. R. B. v. Local 815, 2 Cir., 1961, 290 F.2d 99, 104.

■ Respondents further contend that the Supreme Court's holding in N. L. R. B. v. Wooster Division of Borg-Warner Corp., 1958, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823, prohibits this court from enforcing the contract. Although the International Union is the certified bargaining representative of the respondents' employees, the only party to the contract which the Board ordered the respondents to sign is the uncertified local. The Borg-Warner case held it an unfair labor practice for one party to insist that the uncertified local rather than the certified International be made a party to a contract where the other side refused to accept such a provision. The Supreme Court reasoned that since the duty to bargain was limited to certain subjects, not including a clause recognizing an uncertified local, insisting that the other party accept such a clause constitutes a refusal to bargain in violation of § 8(a) (5) of the Act. However, as the Supreme Court recognized in Borg-Warner, a clause voluntarily agreed upon by the employer and union recognizing the uncertified local as the bargaining representative would be lawful and enforceable. 356 U.S. at page 349, 78 S.Ct. at page 722. In the present case, respondents and the Union agreed upon the recognition clause. Consequently, it poses no bar to requiring respondents to sign the contract.

■ In fact, the respondents never urged at the hearing or even before the Board, that the International rather than the local should have been the party to the contract. Therefore, not having made timely objection as required by § 10(e) of the Act, 29 U.S.C.A. § 160(e), the question is not even open on review.

■ Since the original complaint alleged that Winchester refused to bargain, but did not mention Pyne in this respect, the trial examiner did not recommend that Pyne execute the contract. The Board, after granting the General Counsel's motion to amend the complaint to include Pyne, ordered Pyne to execute the contract. Rogers testified that he was negotiating for an agreement covering both Winchester and Pyne, and Connor testified that he represented both. Furthermore, in a letter which bears the heading "Re: Winchester Electronics, Inc., and Pyne Molding Corporation" Mr. Millar discussed the dispute over the contracts. Therefore, there was sufficient evidence to support the Board's finding that Connor acted as an agent of both Winchester and Pyne. And since the respondents stipulated that they constitute a single employer, Pyne was not prejudiced by the amendment.

■ Winchester objects to the trial examiner's finding, adopted by the Board, that layoffs at the Danielson and New Milford plant and the opening of

the Oakville plant were motivated by a desire to eliminate the union. Winchester claims that a labor shortage and transportation problems account for the Danielson layoffs. However, since the assembly work performed at Danielson requires no particular skill or physical ability and Danielson was at that time Connecticut's area of greatest labor surplus, the Board seems clearly justified in rejecting the labor shortage excuse. The only evidence of a transportation problem is that Danielson is 100 miles from New Milford. However, Winchester was well aware of that fact when the Danielson plant was opened in 1957, when additional space was leased in 1958, and when expansion of the plant was contemplated in early 1959. In fact, Winchester intended to expand their Danielson operation right up to the time of the election of the Union as the representative of the Danielson employees. Since then Winchester has been contracting its Danielson operation. Actually, the Danielson as well as the New Milford layoffs coincided with the opening of an unorganized Oakville plant. Although Winchester claims that the New Milford layoff was intended to permit the installation of new equipment, after four months no order for such equipment had been placed. In light of Winchester's earlier threats to shut down the plants if the Union won the election and a supervisory employee's statement that there was going to be a big layoff soon because the employees had been "very disloyal to Mr. Burtt by getting the Union in there," the Board was justified in finding that the layoffs and opening of the new plant were primarily motivated by opposition to the Union and thus violated § 8(a) (3) and (1) of the Act.

The respondents' final objection relates to the Board's reinstatement order. It is unnecessary for the complaint to spell out the details of the relief to be requested if it is found that the Act has been violated. Section 10(c) of the Act specifically empowers the Board to grant these remedies. There-

fore, if the complaint alleges unfair labor practices that could result in the Board's use of such a remedy, the respondents have been sufficiently informed. See Republic Steel Corp. v. N. L. R. B., 3 Cir., 1939, 107 F.2d 472, 474, 478–479, modified as to another point 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; N. L. R. B. v. Midwest Transfer Co. of Illinois, 3 Cir., 1961, 287 F.2d 443, 446. However, the Board's order that respondents reinstate with back pay all employees who were laid off or who had struck was too broad. The respondents should not be required to offer reinstatement to those employees who previously refused reinstatement to substantially equivalent employment. And back pay as to such employees should be awarded only until the time of such prior offer of reinstatement.

The order is enforced as modified.