**WHITE SULPHUR SPRINGS COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16966.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 13, 1962.

Decided March 7, 1963.

Washington, Circuit Judge, dissented.

Mr. Paul S. Hudgins, Bluefield, W. Va., with whom Mr. Edward A. Martin, Washington, D. C., was on the brief, for petitioner.

Mr. Glen M. Bendixsen, Atty., N. L. R. B., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N. L. R. B., were on the brief, for respondent.

Mr. Martin F. O'Donoghue, Washington, D. C., entered an appearance for Local 651 United Ass'n, as amicus curiae.

Before WASHINGTON, DANAHER and BURGER, Circuit Judges.

DANAHER, Circuit Judge.

This unique case involves the Board's conclusions that our petitioner had engaged in unfair labor practices. Despite a long history of apparently harmonious labor relationships with the charging party, the petitioner was said to have discriminated against two employees named Compton and Boone. One initially mishandled episode arising out of chance remarks on a Friday afternoon resulted: (1) in the employer's imposing an improper condition for the retention of employment by Compton and Boone; and (2) almost as rapidly, overnight, in the employer's unconditional offer the next morning to reinstate the two men with full pay for the few hours' lost time. The men did not accept the offer. The Board's Decision and Order, 136 N.L.R.B. No. 30, observed that the Saturday offer was "made in good faith."

The employer renewed the offer of reinstatement on the following Monday. Again, Compton and Boone did not accept

and return to work with the afternoon shift. Notwithstanding, the Board ordered reinstatement with back pay. The principal issue—although there are others which will be mentioned—is whether or not the law requires that an employer at his peril must keep open his bona fide offer of reinstatement until the *union* decides whether or not the offer is to be accepted.

### Background

The petitioner, White Sulphur Springs Company, at all times mentioned herein, operated the Greenbrier Hotel in the small town of White Sulphur Springs, West Virginia, and there employed about 1,000 persons. Since about 1948, most employees were represented by six unions, one of which was United Association of Journeymen Plumbers and Pipefitters and Apprentices of North America, Local Union 651, AFL–CIO, the charging party. The Local's business agent, Hunt, had headquarters at Charleston, West Virginia, about 125 miles from the Greenbrier Hotel. Local 651 had about 117 members scattered throughout various West Virginia counties, but only six such members were employed at the Greenbrier. The other 111 plumbers had no voice in contracts for the Greenbrier plumbers. Perhaps because of the distance factor, "it was always the practice of the Union" as the Trial Examiner found, for Hunt "to let the six [or] seven plumbers employed by [the Greenbrier] decide under what terms and conditions they were to be employed."

The record, including Hunt's own testimony, overwhelmingly "establishes that the Union acquiesced in the local unit's [Greenbrier plumbers] negotiation of their own contract with [petitioner], and merely required it to notify Union headquarters [Hunt] of the results thereof by a letter of intent.[1] It was after this information was received and presumably with full knowledge of how accord was achieved, that the formal written contracts were signed by Union officials."[2] The Trial Examiner so found, and the record supports him.

"Until this [instant] proceeding was instituted," said the Trial Examiner in his Intermediate Report, "not a single voice was uttered in protest thereof by any union official, nor was there any suggestion that Respondent's meetings and negotiations with the men was in derogation of the Union's status as collective bargaining representative."

---

1. In 1958 Hunt had thus been notified as to the desires of the Greenbrier plumbers concerning the terms of the contract later negotiated for the year 1958, by letter as follows:

"Mr. J. L. Hunt, Business    May 28, 1958
  Agent
"United Association of
  Journeymen * * *
"Dear Mr. Hunt:
  "The membership of Local 651, United Association of Journeymen Plumbers and Pipefitters and Apprentices of North America, agree to the terms of the enclosed Contract and wish it be signed. As Shop Steward for our local, I am sending this information along with the Company's letter and the Contract forms.
          "Sincerely yours,
          "MICHAEL LAKE MURPHY
          "Shop Steward
          "Local 651"

2. In June, 1959, the Greenbrier plumbers after a three day walk-out, returned to work without a contract. When the employer later sought to formalize their status, Hunt himself requested during a long distance telephone conference, that he be given advices from the men by letter. The personnel manager then called the men, informed them of Hunt's desire, and Boone and all the other plumbers except Compton signed the following letter:
"Mr. J. L. Hunt          July 30, 1959
"Business Agent
"L. U. 651
  "It has been agreed on by the undersigned to accept the contract as offered by the Company and would like your signature as approved.
  "By doing so, we would then be granted the (8) cents an hour wage increase which has automatically been retracted. [sic]."
  Thereafter Hunt and the employer executed the 1959 contract, still in force in June, 1960, and by its terms, automatically to run until June, 1961.

He concluded that the Local had authorized its White Sulphur Springs unit [the Greenbrier plumbers] to continue that practice in 1960, and that the petitioner's conduct in these last negotiations was not violative of the Act. The Trial Examiner knew there had been no labor dispute between the employer and the Greenbrier plumbers. They had not crossed the picket line after several hundred other workers went on strike June 23, 1960. The Examiner knew that upon termination of the strike as of July 19th, the plumbers reported for work, including Compton at noon on July 20, and Boone at 8 A.M. on July 21. He knew that the plumbers then hoped to be accorded the. raise which had been granted to the others, such as the electrical workers.

The employer knew that since the 1959 contract with the plumbers had nearly a year to run, it was in no position to grant a unilateral increase. When the plumbers on July 21, 1960 sought the increase, the employer met with them and gave them their choice to be exercised *by noon* of July 25, either to continue under the 1959 contract, or to initiate steps to work out a new contract.

Against that background and in light of other details, the Trial Examiner appraised the evidentiary showing on the whole record made before him and summed up as follows:

"Though I am mindful of the well-established principle that where a collective bargaining representative of employees has been chosen by them, it is incumbent upon the employer to bargain with that representative and no other I am nevertheless convinced that, *under the circumstances existing here*, Respondent's conduct was not violative of the Act. (Emphasis in the original.)

"I find no evidence in this record that Respondent engaged in negotiations with the employees 'to the exclusion of the employees' collective bargaining representative,' as claimed by the General Counsel. Indeed, the letter of intent, the very document which occasioned this entire proceeding and upon which the General Counsel relies, was prepared for the plumbers by Respondent and states 'that a contract will be executed on their behalf between [the] Union' and Respondent."

The sequence of events in the critical period, July 21–25, 1960, will later be developed. Importantly for the present, on Friday, July 22, the employer's chief engineer, Way, brought to the plumbers' shop the document prepared the previous day and now known as the letter of intent.[3]

He had been informed that a majority of the men "were in favor of receiving the wage increases and other benefits." He placed the letter on a table with a copy of the proposed new contract, with changes marked in red so that the men might readily note new items. He left the documents with the men that the business might be discussed. When he later returned with the plumbers' foreman, Walton, he found that four of the men had already signed the letter. Compton and Boone had not yet done so. Compton uttered a critical comment. Way vented

3. The text in full reads:
"July 21, 1960
"LETTER OF INTENT
"The undersigned members of United Association of Journeymen Plumbers and Pipefitters and Apprentices of North America, Local Union 651, A.F. of L.—C.I.O., hereby declare that they desire to return to work for the White Sulphur Springs Company and *that a contract will be executed on their behalf between the said Local Union and the said White Sulphur Springs Company, containing* wage rates as follows: an increase of 3¢ per hour over the wage rates set forth in a contract dated June 16, 1959, between the Company and the Union, with an additional increase of 3¢ per hour effective January 1, 1961, plus an additional 5¢ per hour effective January 1, 1962, the new contract to expire December 15, 1962, and to contain the other provisions contained in the Agreement dated July 18, 1960, between the Electrical Workers Local Union #637 and the, Company." (Emphasis added.)

what should have been taken as an irrelevant rejoinder. But as can happen, Compton ascribed to it greater importance. Thereafter an impasse developed from the erroneous emphasis accorded to the verbal exchange. As a result, Compton was presently to telephone Hunt in Charleston to report that the employer was then treating the contract as having been breached. The employer in fact had offered to enter into a new contract only if the men voted to do so. The alternative was open to them to continue under the 1959 contract—which they finally did. We can understand the employer's desire to get the hotel reopened, and that the work of the plumbers was essential, but Way never should have put pressure on Compton and Boone. It is clear that Way told Compton and Boone that unless they signed the letter, they could not work.

That last circumstance created a violation of section 8(a) (1), and we so hold despite petitioner's claim to the contrary. As the record supports the findings and conclusions of the Examiner on this aspect of the case, such conduct by Way may be construed as restraining and coercing the plumbers in the exercise of their rights, protected both by their contract and by the Act.[4] The Board correctly so agreed. Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 683, 684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Lion Oil Company v. National Labor Relations Board, 245 F. 2d 376 (8 Cir., 1957); D. H. Holmes Co. v. National Labor Relations Board, 179 F.2d 876, 879 (5 Cir., 1950).

4. National Labor Relations Act, as amended, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq. (1958).

5. The same "conduct" might be said in a narrowly technical sense to constitute a violation of sections 8(a) (3) and 8(a) (5) as well. To reach that conduct as a practical matter, since the employer took prompt steps in good faith to cure its discriminatory conduct, we will make certain that the employer shall be ordered to cease and desist from discharging or threatening any employees with loss of employment because of their exercise of rights guaranteed by the Act.

As to the section 8(a) (3) and 8(a) (5) charges, the Board in its Decision and Order, noted that the "facts are accurately stated by the Trial Examiner," but it rejected his conclusions. We grant that the employer should not have threatened Compton and Boone with discharge.[5] We observe at once that the record supports the Examiner's finding that next day "both men were offered reinstatement and back pay on July 23, and were again offered reinstatement on July 25, both of which offers were rejected." He added: "Under these circumstances, I find no authority which authorizes me to require that Respondent repeat its offer to these two men." (See note 10 infra.)

### Issues

Our issues really arise from the lack of substance to sustain the conclusions predicating the Board's order. Critical items of purported fact are not supported, as we shall develop. To the contrary, the entire record, in support of the Examiner, shows that the employer's offers, both on Saturday, July 23,[6] and Monday, July 25, 1960, were unequivocal and without condition of any kind. Even were we to say that technically, the Friday discharge was discriminatory and so violated section 8(a) (3), that factor here presents no real issue. The employer moved promptly to dissipate the effect of the mistaken action of its employee Way. The Board's Decision expressly set forth that since the Saturday offer was "made in good faith, we shall not hold [the employer] liable for back pay from Saturday, July 23 * * *."

6. Hunt, Friday afternoon, told Compton to "stay on the job." Compton testified he "took it" on himself "to leave that afternoon at quitting time because I had been informed by Mr. Way there wasn't any use in coming back unless we had intentions of signing the letter."

But the next morning the other four men abandoned the letter of intent, went back to work under the old contract, and the employer promptly offered reinstatement and pay for lost time to Compton and Boone.

The law required the employer to do no more than it did on Saturday morning. Hunt by telephone Saturday morning told Murphy, a former shop steward, that he and the other three men were to go back to work provided they did so under the "old contract" and that Compton and Boone were reinstated with back pay. Murphy so advised the employer, and he and the other plumbers accordingly went back to work, abandoned the letter of intent, and the employer by 11 A.M. notified both Compton and Boone to report for the afternoon shift, with back pay for their lost time. The record does not support a conclusion that the Friday discrimination thereafter continued.

Confronted with such a record, the Board in its Decision said that a section 8(a) (3) violation occurred because the employer held open its offer of reinstatement for "an unreasonably [7] short time." The Board's language may be interpreted to mean, as Board counsel orally argued, that the bona fide offer of reinstatement to Compton and Boone must as a matter of right be held open until their *union* might decide whether or not the unconditional offer was to be accepted. We find no language in the Act for that proposition and no authority which has so reasoned, whether with respect to the Saturday offer, the Monday offer, or the employer's final refusal to reinstate after acceptance had come too late. From the beginning, Monday noon had been fixed as the deadline for decision. The employer certainly was entitled to know where it stood, especially when the whole situation had evolved in the first place from the desire of the plumbers to secure a raise

■ The record thus sustains the Examiner. It is barren of evidence that the employer was guilty of unlawful discrim-ination where it promptly offered to reinstate Compton and Boone and to reimburse them for the time lost. That is particularly true since the Board, as it did, was bound to recognize and concede the employer's good faith in seeking to make amends.

■ The remaining issue has to do with the Board's conclusion that section 8(a) (5) was violated in that the employer dealt "directly with the employees in the bargaining unit." Of course, in one sense, it did so, but under circumstances we have already noted and *not* to the exclusion of the Union. The Board recognized, as the Examiner had made abundantly clear, that these six Greenbrier plumbers, their Local and its business agent in dealing with this employer, had established what the Examiner had called a "pattern of conduct," satisfactory to all parties. Yet, it was "different" this time, said the Board, because the employer "was seeking to *modify* the [presently outstanding] agreement by presenting the business agent with a *contract* already approved by the employees, without his intervention or representation." (Emphasis added.) The record taken as a whole does not sustain the Board.

First, there was no such 1960 "contract." No party was bound. The Board itself said the employer was seeking to "modify" the 1959 agreement, obviously recognizing it was still in force. No such 1960 "contract" was thereafter consummated, and the men who remained on the job continued to work under the 1959–1961 agreement. What was signed by four of the men was a letter, which expressly and in so many words contemplated "that *a contract will be executed on their behalf between the said Local Union and the said White Sulphur Springs Company*." The device of utiliz-

---

7. Surely the men could have made their own decision. It is unlikely the Board was speaking only of the time element. Compton and Boone could have gone back to work and still have filed a grievance. As shop steward, Compton was familiar with the terms of the contract and had handled grievances for the men. He testified he knew he had a right to file a grievance. The contract called for "no suspension of work" and that "an honest effort" be made to settle differences "immediately." It further provided for filing of a grievance "within two (2) days after the happening * * * otherwise, such grievance shall be barred from consideration." The section was not so invoked.

ing such a writing previously had been created, the record shows, not by the Company, but by the Local's business agent, Hunt, and for his information.

Next, the Board recited in its reconstruction of the situation that the employer's chief engineer "explained to the six plumbers that if they signed the letter of intent indicating approval of the new contract, the Employer would put the new wage provisions into effect." We have scoured the transcript without finding a line of evidence to sustain the Board's finding to any such effect. There is nothing to show that the letter in 1960, as in 1958 and 1959, had or was intended to have any greater purpose than to indicate to the business agent Hunt the basis upon which a new contract was to be evolved.[8]

In any such situation involving what Compton called "business," Hunt, the business agent, either in person or by mail, had procured over the years a canvass of the men. He then relied upon and followed the majority position upon receipt of advices as to what it was. Hunt testified that when he "met with the [Greenbrier] men, they would give me permission to open it or tell me what they wanted." Thus in February, 1959, he acted "to open the contract provision pertaining to wages." So in 1960, the plumbers voted *not* to reopen the 1959–1961 contract, and Compton sent word to Hunt they would "leave her like she is, the majority said, and if Mr. Wright gives anybody a raise, he will give us all a raise." Again, as recently as July, 1959, Hunt acted in accordance with the letter of intent, supra note 2, pursuant to which he "signed the contract." "Q. Did you do that because a majority of the men in the local unit at the hotel had indicated they wanted this contract signed? A. I would say yes." "Q. Did you ever complain of the fact that the

men had signed this letter of intent? [supra note 2] A. Not to my knowledge."

The record simply does not sustain the Board's findings in the mentioned respects upon which it rested its conclusions. There was no suggestion at any time by the employer that it would unilaterally—and without negotiation with Hunt—grant wage increases, or otherwise reject the 1959–1961 contract. Called as a witness by the General Counsel, the employer's general manager Wright, was corroborated by Compton and Boone. Wright's exact testimony ran thus:

"Q. By [General Counsel] Did you tell the six plumber employees that they could receive wage increases and other benefits given to the other hotel employees represented by the labor organizations other than the charging party if the plumbers so desired? A. If they so desired and negotiated a new contract through their Business Agent.

"Q. Did you tell the plumber employees that if they chose to receive the new wages and the benefits that a new collective bargaining agreement would have to be had between the hotel company and the charging party? A. Yes, sir.

"Q. Did you tell the six plumber employees that they always had a choice of working under the terms and conditions of their contract which was effective June 16, 1959, which is General Counsel's Exhibit No. 2? A. Yes, sir."

The plumbers were given the period July 21–July 25 within which to make their own decision. Except for that Friday afternoon's mischanced episode, there would be nothing whatever to this case,[9] and such "discrimination" or other un-

---

8. The exact situation may be illuminated by reference to the 1959–1961 contract, its terms and its draftsmanship in comparison with the 1959 "letter of intent," then requested and received by Hunt. See the letter, supra note 2, after which

a completed and extensive contract was entered into, signed by Hunt for the Greenbrier plumbers.

9. If this case had arisen from some industrial dispute, if there had been evidence of

toward result as might be attributed to that circumstance, was cured by the employer's bona fide offer to reinstate Compton and Boone with pay for the time they had lost. It might even have been concluded that the employer so acted—not in derogation of the Local's position under the 1959–1961 agreement—but because of it. Hunt told Murphy and the latter told his superiors, the plumbers were to go back to work Saturday morning under the "old" contract, provided Compton and Boone were reinstated with back pay. The offer followed.

### Conclusion

Since the Board's action had here been challenged as shown, it devolved upon us to review the whole record. That we have done with scrupulous care. A reviewing court is not "barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); cf. United Wholesale, etc., Emp., etc. v. N. L. R. B., 108 U.S. App.D.C. 341, 282 F.2d 824 (1960).

Neither on the law nor on the evidence, taking the record as a whole, can we sustain the Board with reference to the issues we have outlined. We are persuaded that the Board erred in ordering the reinstatement [10] of Compton and Boone.

Additionally we have concluded that taking into consideration all aspects of the relationships between this employer and its unions representing many hundreds of employees, and particularly the long-pursued course of dealings with Local 651, the Examiner correctly evaluated the over-all problem.[11]

The Board's order will be modified in conformity with this opinion and, as modified, will be enforced.

WASHINGTON, Circuit Judge (dissenting).

In this case, the Board found that the following sequence of events had taken place: Shortly after the strike by the other employees of the Company was settled and new contracts were signed with unions representing those employees, a meeting was called by the Company in response to inquiries by some of the plumbers as to whether their wages might also be increased as those of the striking employees had been. On July 21, 1960, the Company's vice president told the plumbers that they could secure increases only if they would accept contracts similar to those that had been concluded with the other unions. In the alternative, they could continue work under their old contract, then in force. Compton, who was shop steward and one of the two employees soon to be discharged, called the Union's business agent, who expressed the view that the contract then in effect could not be changed at that point. The next morning, a Friday, the Company's chief engineer—Way—brought a "letter of intent" and a new contract to the plumbing shop and explained what the letter, which indicated approval of the new contract,

---

labor strife or some anti-union activity, or that it was the outgrowth of one of the many other causes which have given rise to litigation involving the Act, the entire background would possess a different hue. We here have no such situation.

10. Cf. N. L. R. B. v. Winchester Electronics, Incorporated, 2 Cir., 295 F.2d 288, 292 (1961); National Labor Relations Board v. L. Ronney & Sons Furni-

ture Mfg. Co., 206 F.2d 730, 737, 738 (9 Cir., 1953), cert. denied, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954); Nevada Tank and Casing Company, 131 N.L. R.B. 1352, 1353 (1961).

11. See Leader News Co., Inc., 98 N.L.R.B. 119, 121 (1952); Harcourt and Company, Inc., 98 N.L.R.B. 892, 907 (1952); American Laundry Machinery Company, 107 N.L.R.B. 1574, 1577 (1954).

"was supposed to do." While the record fails to elucidate the meaning or details of Way's statement, it is clear that the men understood that they could not have the wage increase unless they signed the letter. Four of the six men in the shop signed but Compton and Boone refused, relying on the advice of the Union's business agent. Later in the day, Way returned and informed Compton and Boone that if they did not sign the letter of intent they "could not work." No work was assigned to the men for the rest of the day.

The next morning Way called Compton at his home and instructed him and Boone to report for work at 12:30 p. m. Way stated that the men would be given back pay for the work they had missed. Compton expressed confusion and told Way that he would like to talk to the business agent before deciding whether to follow the order to report to work. He called the business agent but was unable to reach him over the weekend. Way called again on Monday morning at 11 a. m. and told Compton that he and Boone must return to work by 12:30 that day. Compton told Way that he had not yet reached the business agent and that he was still confused about what to do in view of the business agent's instruction the previous Friday to wait until he heard from him before taking any action. The men did not report to work at 12:30, but Compton did call Way at 2.30 that afternoon, immediately after he had spoken to the business agent and been told by the latter that everything was straightened out and that they should go back to work. Way told him, however, that he and Boone could not return to work because of their failure to comply with the 12:30 deadline.

All of the findings set forth above were —in my view—clearly supported by substantial evidence. On the basis thereof, the Board concluded that the Company had violated Sections 8(a) (1), 8(a) (3), and 8(a) (5), and ordered that the men be reinstated with back pay. The majority opinion, as I understand it, en-forces only that part of the Board's order finding a violation of Section 8(a) (1). I would enforce the order in its entirety.

There is little question in my mind that the Company, by telling Compton and Boone on Friday that they must sign the letter of intent or they could not work, and then refusing to assign work to them when they would not comply with that demand, violated the prohibition of Section 8(a) (3). If there were any doubt on this score, the Company's conduct on Monday certainly removed it. In light of Compton's position that he had been instructed by the Union not to sign, the Company's action clearly tended to discourage union membership within the meaning of the Act. See National Labor Relations Board v. Ra-Rich Mfg. Corp., 276 F.2d 451, 454 (2d Cir., 1960).

With respect to the alleged violation of Section 8(a) (5), the Board's decision stated:

"3. We also conclude that the Respondent violated Section 8(a) (5) by its demand that Compton and Boone sign the letter of intent and by attempting to deal directly with the employees in the bargaining unit, without notice to the Union and without regard for its right to act as their representative."

It seems to me to be beyond dispute that the coercive actions of the Company violated Section 8(a) (5), since they bore an immediate relation to the effort to obtain approval of proposed contractual modifications. Merely because they also amounted to a violation of Sections 8(a) (1) and 8(a) (3) does not render them irrelevant to the Section 8(a) (5) determination. Moreover, I cannot separate the Company's submission of the letter of intent from its coercive effort to obtain unanimous approval of the letter from the employees in the bargaining unit. Whatever practices the Union may reasonably be thought to have acquiesced in, I cannot reach the conclusion, on the basis of the record before us, that it acquiesced in the course of conduct pursued by the

Company in this instance. Consequently, I think the Board's finding that the Company violated Section 8(a) (5) should be affirmed.

The remaining question for decision is, as I view the case, whether the Board exceeded its power in ordering reinstatement as a remedy for these violations. The source of the Board's authority to order reinstatement with or without back pay is Section 10(c) of the Act, which reads, in relevant part, "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue * * * an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, *as will effectuate the policies of this Act * *.*" (Emphasis supplied.) This language is clearly designed to give the Board the widest latitude in its selection of remedies once it has duly found that an unfair labor practice has been committed. See National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). In the Virginia Electric & Power Company case the Court stated that the Board's choice of remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Id., at 540, 63 S.Ct. at 1218. The majority opinion does not specifically conclude that the order of reinstatement with back pay in this case was "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," and I think such a conclusion could not be justified on this record. I would accordingly uphold that portion of the Board's order, and in fact the order as a whole.