**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PEPSI–COLA BOTTLING COMPANY OF MIAMI, Inc., Respondent.**

No. 71–1528
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Oct. 13, 1971.

Rehearing and Rehearing En Banc Denied Dec. 28, 1971.

---

* [1] Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., for petitioner.

Glenn L. Greene, Jr., Miami, Fla., for respondent.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This case is before the Court upon application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, 29 U. S.C.A. § 151 et seq. (the Act) for enforcement of its cease and desist order against Pepsi-Cola Bottling Company (the Company) based on violations of Sections 8(a) (5), 8(a) (3), and 8(a) (1) of the Act.

The facts, largely stipulated, are not in great dispute. The Company is engaged in the manufacture and sale of soft drinks in Miami, Florida and employs approximately 300 persons, including the production and maintenance employees who form the bargaining unit in the instant case. On July 17, 1969, the Board conducted a representation election at the Company's plant that resulted in certification of the United Steelworkers of America, AFL–CIO (the Union) as the exclusive bargaining representative of the unit employees on July 25, 1969.

Union representatives Nicholas Fayad and Carlos Suarez met with Company officials on August 29 to discuss contract terms. No agreement was reached, however. On September 5, six unit employees who were dissatisfied with the progress of bargaining engaged in a work slowdown and were discharged by the Company.[1] On the morning of September 8, after working for a brief period, 97 unit employees ceased work and went to the plant manager for the purpose of protesting the discharges of September 5. When the plant manager refused to accede to a demand for reinstatement, the employees sat down in the plant and refused their employer's demand that they return to work or leave the plant. The employees made no attempt to seize the plant or machinery, did not engage in violence or make threats of violence, and did not damage plant equipment. Shortly after refusing management's request to leave, all 97 employees were discharged for what Company officials characterized as an "illegal sit-down strike." Shortly before noon, the Company telephoned the police, who upon arrival requested the employees to leave the premises. The employees complied with this request and began picketing outside with signs protesting the Company's alleged unfair labor practices.

At the meeting on August 29, the Union had presented a proposed contract with detailed rates of pay and other benefits. The Company's counterproposals submitted a few days later contained no offer concerning wages, pensions, vacations, holidays or insurance but specified that these matters were to be discussed

---

1. No contention is made, nor did the Board find, that the discharge of these six employees was unlawful. Cf. NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); Elk Lumber Co., 91 NLRB 333, 26 LRRM 1493 (1950); Faber Bros., Inc., 94 NLRB 748, 28 LRRM 1090 (1951).

at a later meeting with no formal company proposals to be submitted on these points until that time. Union representatives met with the Company again on September 8. The Union demanded reinstatement of the six employees discharged on September 5, and the Company refused. The Union met with the Company for a third time on September 15. The Union requested a wage increase, and the Company offered approximately 7 cents per hour for all employees. The Union rejected the offer.

On September 17, the Company's general manager, Herbert Paige, met with Julio Ochoa, one of the six employees discharged on September 5. Upon assurances that the employees did not wish to deal further with the Union, Paige told Ochoa that the Company would give the employees a wage increase of 25 cents per hour and would reinstate all 103 discharged employees. Paige also told Ochoa that the Company would give each employee one week's pay, which would be considered a loan at first, and an outright gift later if production increased.

The following day, September 18, Company counsel Greene called Union negotiator Suarez and informed him that the Company was standing pat on the 7 cent per hour wage offer and refused once again to reinstate any of the discharged employees. That same day, Greene sent a letter to Union negotiator Fayad confirming this position and cancelling a negotiating session that had been scheduled for September 22. Greene stated that he had to be away from Miami all that week bcause of an emergency with one of his out-of-state clients. In this letter Greene also stated that the Union's demand for reinstatement was illegal and could not be made a condition precedent to reaching an agreement. He concluded by stating:

If and when you desire to negotiate about legitimate contract issues, we will be most happy to meet with you at a mutually convenient time; otherwise, we see no point in continuing our discussions.

That same day, September 18, Paige again approached Ochoa and another discharged employee, Pedro Goderich, and repeated the offer of reinstatement for all employees and a 25 cent hourly wage increase. Paige also promised that the Company would improve its employee insurance program, attempt to improve allowance for uniforms, and keep the production bonuses in effect at the plant. The Company made none of these offers to Union representatives Fayad or Suarez.

On September 22, the Company reinstated all the discharged "strikers" as well as the six employees discharged on September 5. The employees accepted reinstatement and stopped picketing. That same day, Union negotiator Fayad wrote Paige objecting to the Company's having met with the local union committee members without notifying the Union negotiating team. The Union also protested the Company's cancellation of the bargaining session that had been scheduled for that day and to the Company's failure to provide another negotiator to replace Greene. The Union insisted that the negotiations had not reached an impasse, adding "We are certain that if you intend to bargain in good faith we can reach a settlement." The Company never responded to this letter and no further bargaining sessions between the Union and the Company were held.

On September 23, Paige made a speech to all employees in which he stated that the Union was dead at the plant, that he would deal with an employee committee concerning employee complaints, and that his door was always open to individual complaints. Paige further promised that the employees would receive a 25 cent per hour across-the-board pay increase, a better insurance plan, and one week's pay for the time they were on strike. Subsequently, on September 24 and October 2, Paige met again with certain employees and agreed to provide better ventilation and improved toilet facilities at the plant, and a 15-minute break period. About a week later, the Company gave each employee the promised hourly wage increase of 25 cents.

Upon the foregoing facts, the Board found that the Company had violated Section 8(a) (3) and (1) of the Act by discharging the 97 employees for engaging in protected concerted activities on September 8. The Board further found that the Company had violated Section 8(a) (5) and (1) by refusing to meet and negotiate with the Union as the employees' exclusive bargaining representative, by bargaining directly with its employees, by unilaterally granting them higher wages and better working conditions than it had offered the Union, by telling the employees that the Union was dead at the plant, and by offering to deal with an employee committee concerning employee complaints.

The Board's order requires the Company to cease and desist from the unfair labor practices found and from in any other manner interfering with its employees in the exercise of their Section 7 rights, to bargain with the Union on request, and to post appropriate notices.[2]

The Company resists enforcement of the Board's order on the following bases.

## I. Discharges

The Company, relying on NLRB v. Fansteel Metallurgical Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939), argues that the so-called "sit-down strike" of the 97 employees did not constitute concerted activity protected under Section 7 of the Act.[3] The discharges would, therefore, be for cause and would not violate Section 8(a) (3) and (1).

In *Fansteel*, 95 employees, responding to their employer's unfair labor practices, took over and held two of the employer's key buildings, causing the remainder of the plant to cease operation. Late in the afternoon, after the employees' shift had ended, the plant super-intendent, accompanied by police officers, came to the plant and demanded that the employees leave. Upon their refusal, the men were discharged. The employees continued to hold the buildings for nine days, during which time a pitched battle occurred between workers and police officials upon efforts of the police to evict the strikers. Only upon reinforced police efforts were the employees finally forcefully evicted.

Holding the sit-down strike to be illegal and unworthy of the Act's protection, the Court stated:

But reprehensible as was that conduct of the respondent, there is no ground for saying that it made respondent an outlaw or deprived it of its legal rights to the possession and protection of its property. * * * We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property or other unlawful acts in order to force compliance with demands. To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.

59 S.Ct. at 495.

Further, the Supreme Court noted: This was not the exercise of "the right to strike" to which the Act re-

---

2. No order to reinstate the 97 discharged employees with back pay was given in that the employees had already been reinstated and the interval between the demand for reinstatement and actual reinstatement was less than 5 days, the period customarily granted by the Board in such cases.

3. *See also* Stewart Die Casting Corp. v. NLRB, 7th Cir. 1940, 114 F.2d 849, cert. denied 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119 (24-hour sit-down); McNeely & Price Co. v. NLRB, 3d Cir. 1939, 106 F.2d 878 (six-day sit-down).

ferred. *It was not a mere quitting of work and statement of grievances in the exercise of pressure recognized as lawful.* * * * When the employees resorted to that sort of compulsion they took a position outside the protection of the statute and accepted the risk of the termination of their employment upon grounds aside from the exercise of the legal rights which the statute was designed to conserve.

\* \* \* \* \* \*

There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights. * * * To secure the prevention of unfair labor practices by employers, complaints may be filed and heard and orders made. The affirmative action that is authorized is to make these remedies effective in the redress of employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct. We are of the opinion that to provide for the reinstatement or reemployment of employees guilty of the acts which the Board finds to have been committed in this instance would not only not effectuate any policy of the Act but would directly tend to make abortive its plan for peaceable procedure.

59 S.Ct. at 496–497.

The Company takes the position that all sit-down strikes are thus unprotected by Section 7 and are "not a legitimate weapon to be used in the field of labor relations." The cases since *Fansteel,* however, are clearly contrary to this contention.

For example, NLRB v. American Manufacturing Company, 2d Cir. 1939, 106 F.2d 61, likewise involved a tempo-rary work stoppage induced by an employer's unfair labor practices. The employees refused the employer's order to return to work or leave, but the court refused to consider such activity an illegal sit-down strike which would permit termination of employment, stating:

They (the employees) certainly were *not claiming to hold the premises in defiance of the right of possession of the owner* and we regard the case as no different from that of an ordinary strike where work has ceased because of an unfair labor practice.

106 F.2d at 68 (emphasis added).

In this Circuit similar activities have likewise been protected. In Olin Industries, Incorporated, Winchester Repeating Arms Co. Division v. NLRB, 5th Cir. 1951, 191 F.2d 613, a group of employees refused to return to work after their lunch break, during which time demands were presented to the employer. Plant guards were called but there was no violence and at the Union's suggestion, work was resumed shortly. The Court found the Board's determination that the resulting discharges were violative of Section 8(a) (3) to be supported by the record.

In Cone Mills Corporation v. NLRB, 4th Cir. 1969, 413 F.2d 445, a panel of the Fourth Circuit did find analogous activity to be unprotected. In *Cone Mills,* fifteen or twenty employees engaged in a work stoppage to protest the discharge of a fellow employee. The union steward, in spite of established grievance procedures to the contrary, demanded the immediate reinstatement of the discharged employee before beginning discussions. Several of the employees stated they would continue to stand by their machines and refuse to work until the discharged employee was rehired. One stated he would have to be evicted before he would leave. After several employer requests to return to work or leave, the employees were discharged. The court, relying heavily on the regular grievance procedures in effect and finding that the employees had already made their feelings known con-

cerning the previously discharged employee, found no violation of Section 8(a) (1).

However in NLRB v. Serv-Air, Incorporated, 10th Cir. 1968, 401 F.2d 363, involving employees' refusal to return to work until certain grievances were discussed further, the court stated: *"[i]n the absence of an established grievance procedure* a spontaneous work stoppage to present a grievance was a protected activity."

The real issue boils down to whether the activity of the employees in the instant case is more closely analogous to the actions of the employees in *Fansteel* and *Cone Mills* or to those in *Olin Industries, American Manufacturing* and *Serv-Air.*

We find no facts in the instant case tending to show that the employees were claiming to hold the premises in defiance of the owner's right of possession. The employees had worked for part of the work shift already and the sit-down did not, nor did it threaten to carry over into the next shift. Furthermore, the employees left immediately when requested to do so by the police. The mere act of sitting down on the job in order to further discussions with an employer, as was done in the instant case, can alone furnish no basis for a finding that the acts constituted a forcible seizure of the employer's property. *Fansteel* does not so hold, and we know of no case that does.

The strikers were not shown to have interfered with the work performance of non-strikers, and their actions were unaccompanied by violence or the threat of violence. The Company would have us hold that any sit-down activity necessarily carries with it a threat of violence sufficient to clothe the employer with the right to discharge those responsible. We reject any such notion. Without more than the mere act of sitting down during a labor dispute, there is no more incitement or probability of violence than is necessarily incidental to any other act.

The Company contends that its employees became illegal trespassers subsequent to management's order to leave the plant, and their activity can thus not be condoned or protected by this Court.[4] We do not agree. In all similar work stoppage cases previously discussed, the employer had ordered his employees to leave or return to work. We do not, therefore, deem this factor to be dispositive of the instant case. An employer cannot convert a protected in-plant work stoppage into an unprotected trespass by the simple expedient of ordering his employees from the plant where, as here, such an order serves no immediate employer interest and unduly restricts the employees right to present grievances to their employer. The employer interest in maintaining an established grievance procedure and the absence of restriction on employees in the face of such procedures, such as that found in *Cone Mills*, is not present in the instant case. At the time of the sit-down strike, negotiations between the Company and the Union had just begun pursuant to the Union's certification only two months prior. There is no evidence of any established, regular procedure by which employees were to present their grievances. Under such circum-

---

4. The Company relies heavily upon a Florida statute, which provides in pertinent part:

Whoever willfully:

(1) Enters into the enclosed land and premises of another or into any private residence, house, or building of another, having been forbidden so to enter by the lawful occupant;

(2) Not having previously been forbidden, is warned to depart therefrom and refuses to do so;

\* \* \* \* \*

shall upon conviction be punished \* \* \*. F.S.A. § 821.01 (Supp.1970)

Because of our decision under the circumstances of the instant case we have no occasion to decide at this time whether this statute could be utilized against employees in any case within the context of a labor dispute.

stances, we cannot find that the employees had no interest in presenting their grievance in the manner chosen in the instant case.[5]

We find the Board's decision to be supported by substantial evidence and in no way contrary to the Supreme Court's decision in *Fansteel*. We, therefore, grant enforcement to this portion of the Board's order.

## II. Refusal to Bargain

The Company contends that the Board's determination that the Company refused to bargain cannot be supported because the Union effectively negated the necessity for further bargaining by demanding an unreasonable and improper condition, the rehiring of the six justifiably-discharged employees, as a prerequisite to reaching an agreement.

■ This contention finds no support in the record. The trial examiner found that the Union presented its position on the strikers' reinstatement not as an unconditional demand, but rather as a bargainable issue. Such request did not, therefore, excuse the Company from its duty to bargain further. See National Licorice Company v. NLRB, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940); Midwestern Instruments, Inc., 133 NLRB 1132, 48 LRRM 1793 (1961). Furthermore, the fact that the Company reinstated the employees shortly after the letter of September 18 indicated to the trial examiner that such demand was not the real cause of the Company's refusal to bargain. Rather the Company's

purpose was to avoid bargaining with the Union and subvert its influence by giving the employees reinstatement and improvements in wages without discussion.

■ At any rate, even if it could be found that such an nonnegotiable demand was made, such misconduct was cured by the Union's letter of September 22, after the reinstatement of all employees, that reiterated the Union's desire to negotiate and expressed the belief that an agreement could be reached if only the Company would agree to meet. This indicated the Union's conciliatory attitude and willingness to bargain on all issues, to which the Company should have been willing to respond in good faith.

These facts, undisputed in the record, destroy the Company's argument and fully support the Board's finding violations of Section 8(a) (5) and (1).

■ The Company further contends that it was relieved of its obligation to bargain during the certification year because of the Union's loss of majority status through no fault of the employer and the employees' clearly indicated desire to cease bargaining through the Union. Assuming that any loss of majority support for the Union was not due to the Company's actions, a contention we find incredible at best, the employer nevertheless had the duty to bargain with the Union during the certification year.[6] Confronted with a similar situation, the Supreme Court in Brooks v.

---

5. The Company also relies heavily on the fact that the employees' action in the instant case was unrelated to any lawful employer conduct, but rather was in response to the employer's lawful discharge of the six employees. Such reliance is misplaced. It is well settled that a concerted work stoppage to protest even a lawful discharge of a fellow employee is protected by Section 7 of the Act. NLRB v. Phaostron Instrument and Electronic Co., 9th Cir. 1965, 344 F.2d 855; NLRB v. Holcombe, 5th Cir. 1963, 325 F.2d 508; NLRB v. Puerto Rico Rayon Mills, Inc.,

1st Cir. 1961, 293 F.2d 941; NLRB v. Solo Cup Co., 8th Cir. 1956, 237 F.2d 521; NLRB v. J. I. Case Co., 8th Cir. 1952, 198 F.2d 919, cert. denied, 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351.

6. See Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); NLRB v. Miami Coca-Cola Bottling Co., 5th Cir. 1967, 382 F.2d 921; NLRB v. Sanson Hosiery Mills, Inc., 5th Cir. 1952, 195 F.2d 350, cert. denied, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669.

NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L. Ed. 125 (1954) stated:

> The underlying purpose of [the Act] is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence.
>
> We find wanting the arguments against these controlling considerations.

75 S.Ct. at 181.

Moreoover, we do not think the facts of the instant case approach the unusual circumstances found in WTOP, Incorporated, 114 NLRB 1236, 37 LRRM 1143 (1955) and Public Service Electric & Gas Company, 59 NLRB 325, 15 LRRM 152 (1944), which might warrant a refusal to bargain.

■■ The Company argues that its bargaining with Ochoa, Goderich, and other employees was permissible because they were not employees after their lawful discharge. Some of these employees, however, were not in the group of six employees justifiably discharged on September 5, and our holding that the September 8 discharges were violative of Section 8(a) (2) (3) and (1) renders this contention meritless as to these employees.[7] Bargaining with individual employees, or with outsiders acting on behalf of all employees in the instant situation, constitutes, even in the absence of employer bad faith, a refusal to bargain in good faith with the Union and a violation of employees' Section 7 rights. Medo Photo Supply Corporation v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); NLRB v. Jones & Laughlin Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); Bilton Insulation, Inc. v. NLRB, 4th Cir. 1961, 297 F.2d 141. The Board's determination in this regard is amply supported by the record.

Because we find no merit to any of the Company's objections, the order of the Board will be enforced.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

**PER CURIAM:**

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

7. Alternatively, the Company contends that even if it is considered to have bargained with employees during the time in which it was obligated to bargain with the Union, its actions were not violative of the Act under Section 9(a).

Section 9(a) provides in pertinent part:

[A]ny individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of * * * [an] agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

29 U.S.C.A. § 159(a)

Assuming, without deciding, that the all-encompassing issues involved in the instant case, the substance of which were the essence of the collective bargaining itself, can be negotiated under Section 9 (a), *contra* West Texas Utilities Co. v. NLRB, 1953, 92 U.S.App.D.C. 224, 206 F.2d 442, cert. denied, 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369; Hughes Tool Co. v. NLRB, 5th Cir. 1945, 147 F.2d 69, we still find the contention meritless. There was admittedly no evidence that the Union did *not* have the opportunity to be present. There was, however, also no proof offered by the Company that the Union *did* have such an opportunity. Because the burden is on the Company in such circumstances, the contention must fail. *See* White Sulphur Springs Co. v. NLRB, 1963, 114 U.S.App. D.C. 409, 316 F.2d 410.