**DICKINSON EDUCATION ASSOCIATION, Plaintiff-Appellant,**

v.

**DICKINSON PUBLIC SCHOOL DISTRICT NO. 1, a Public Corporation, Defendant-Appellee.**

**Civ. No. 9296.**

Supreme Court of North Dakota.

March 31, 1977.

Rehearing Denied April 25, 1977.

Daniel J. Chapman, Bismarck, for plaintiff-appellant.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendant-appellee; argued by Ward M. Kirby, Dickinson.

PAULSON, Justice.

This is an appeal from the order of the district court of Stark County dated October 21, 1976, denying injunctive relief sought by the Dickinson Education Association [hereinafter the DEA].

The instant case arose when the DEA sought to enjoin Dickinson Public School

District No. 1, a public corporation [hereinafter the School Board], from issuing or accepting any teacher contracts with teachers of the school system represented by the DEA as the bargaining unit for its 1976–1977 school term. The DEA contends that such action would constitute an act of bad faith contrary to the provisions of Chapter 15–38.1 of the North Dakota Century Code.

In February of 1976, the School Board, by agreement, recognized the DEA as the exclusive bargaining agent of teachers within its school system for the purpose of negotiating contracts on their behalf for the 1976–1977 school term. The representatives of the DEA and the School Board met in negotiations three times during March of 1976, and four times during April of 1976. At the meeting held on April 28, 1976, the parties agreed that an impasse existed in the negotiations, and thereafter, on or about May 4, 1976, North Dakota's Education Factfinding Commission was notified of such impasse and was requested to hold hearings on said matter, pursuant to the provisions of § 15–38.1–13, N.D.C.C.

The Education Factfinding Commission held a hearing at which both parties were present on May 26, 1976. On June 1, 1976, the Commission issued its written report making recommendations for settlement of the issues on which an impasse existed.

On June 8, 1976, the DEA and the School Board met to consider the report of the Education Factfinding Commission, at which time the DEA accepted one of the Commission's recommendations, and the School Board accepted the remaining two recommendations. No further agreement was reached between the parties. On June 16, 1976, the Education Factfinding Commission's report was published in the Dickinson Press, a daily newspaper published at Dickinson.

On or about June 18, 1976, and thereafter over a period of several days; the School Board caused individual teaching contracts to be sent to all teachers being negotiated with—some of which contracts were returned to the School Board prior to the

issuance of a temporary restraining order by District Judge Alfred A. Thompson, whose order was served upon representatives of the School Board on June 25, 1976.

On July 8, 1976, at a preliminary hearing held before District Judge Larry Hatch, sitting on assignment by the North Dakota Supreme Court, the temporary restraining order issued by Judge Thompson was continued to July 14, 1976, and the parties were ordered to hold at least one more negotiating session prior to such date. Judge Hatch further ordered that if the impasse area of disagreement between the DEA and the School Board was not resolved by July 14, 1976, the temporary restraining order would be dissolved.

The negotiating session ordered by the trial court was held on July 12, 1976, and immediately thereafter, the dispute not having been resolved, the DEA appealed to this court, which granted a temporary stay order dated July 14, 1976. On July 15, 1976, the trial court, apparently without knowledge of the action taken by this court, issued an order dissolving the trial court's prior temporary injunction. This court heard the appeal on August 5, 1976.

On August 5, 1976, our court issued an additional order constituting a further injunction prohibiting the School Board from issuing or receiving teaching contracts pending trial of the main action, and again urging the parties to resolve their differences by additional meetings. An additional meeting was held on August 20, 1976, at which meeting no further progress was made.

Trial of the matter on the merits was held on August 24, 1976, after which the trial court ordered the parties to meet an additional time, with a court reporter to be present to transcribe the proceedings. Accordingly, the parties met on September 2, 1976, but failed to settle their differences. The only area of disagreement remaining at that time was the amount of contributions to be made by the School Board to a health insurance plan—the School Board accepting the recommendations of the Education Factfinding Commission and offering the

equivalent of the cost of a single plan, while the DEA wanted the equivalent of 75% of the cost of a family plan to be contributed by the School Board.

Following the meeting of September 2, 1976, the trial court made its findings of fact, conclusions of law, and order for judgment. Paragraphs II, III, and IV of its conclusions of law stated:

"II.

"That the parties hereto have in good faith complied with the provisions of Chapter 15–38.1 of the North Dakota Century Code and that no sufficient grounds exist for the granting of injunctive relief which would preclude the Defendant from issuing contracts in accordance with the statutory powers and duties imposed upon school boards to teachers seeking to serve said school district during the 1976–77 school term.

"III.

"That there has been no showing that the Defendant acted in bad faith in meeting with and negotiating for the terms and provisions of contracts to be issued or otherwise; that the Defendant has expressed a willingness to accept the recommendations of the State Fact Finding Commission to which the Plaintiff has not agreed.

"IV.

"That under the facts of the case it would be improper for this Court to order a continuance of the Restraining Order previously granted, or to grant injunctive relief which would prohibit the Defendant from issuing teacher contracts for the 1976–77 school year, and accordingly the Plaintiff's prayer for injunction prohibiting the Defendant from issuing such contracts is in all things denied and Temporary Restraining Orders heretofore issued are dissolved."

The DEA contends that the trial court erred in finding that the School Board acted in good faith in the course of contract negotiations with the DEA. Specifically, the DEA contends that three facts combine to demonstrate that the School Board was not negotiating in good faith:

I. That the School Board issued individual contracts prior to the conclusion of the negotiation process;

II. That the School Board refused to change its bargaining position after yearend audits revealed a larger than anticipated cash carryover from school year 1975–1976; and

III. That the School Board held secret "consultations" in violation of North Dakota's "open meeting" law (§ 44–04–19, N.D.C.C.), at which major bargaining positions were discussed and adopted.

Chapter 15–38.1, N.D.C.C., establishes the procedure to be followed in North Dakota for the recognition of and negotiation with teachers' representative organizations. Counsel for the DEA contends that the determination of compliance with Chapter 15–38.1 should be a question of law and not a question of fact, thus removing the findings of the trial court from the operation of Rule 52(a) of the North Dakota Rules of Civil Procedure. We disagree. *Edgeley Education Ass'n v. Edgeley Public School District # 3*, 231 N.W.2d 826, 833 (N.D. 1975).

Only the question of bare formal compliance is a question of law. The only question of law raised herein is whether the provisions of Chapter 15–38.1, N.D.C.C., require a school board to continue negotiations after it has received the report of the State's Education Factfinding Commission, has held a subsequent meeting with the teachers' negotiating unit, and has found an impasse still existed. We find no provision in Chapter 15–38.1, N.D.C.C., which would require such continued negotiations at such a point. Subsection 4 of § 15–38.1–12, N.D. C.C., provides:

"4. The obligations imposed in this section shall not compel either party to agree to a proposal or to make a concession."

We find that the statutory scheme set forth in Chapter 15–38.1, N.D.C.C., recognizes that there comes a point—*after the conclusion of a good faith negotiation process*

—when a school board must be allowed to make contractual offers to the teachers of a school system, which contracts the teachers must choose either to accept or to reject. It should be noted that the provisions of such contracts so offered, relative to the status of negotiations, would be important factors in the determination of a school board's motive.

The trial court, and this court on appeal, is asked to determine whether the School Board complied in good faith with the provisions of Chapter 15–38.1, N.D.C.C. We find such a determination to be a factual determination. As provided in Rule 52(a), N.D.R.Civ.P., which rule controls our review of facts found by a trial court sitting without a jury:

". . . Findings of fact shall not be set · aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . ."

Further, as stated in *Eakman v. Robb,* 237 N.W.2d 423 (N.D.1975), in paragraphs 4 and 5 of the syllabus:

"4. A finding is 'clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court.

"5. Questions of fact decided by the trial court upon conflicting evidence are not subject to reexamination by the Supreme Court."

This court has previously considered what is meant by the requirement of § 15–38.1–12, N.D.C.C., to negotiate in good faith. In *Fargo Education Association v. Paulsen,* 239 N.W.2d 842, 847 (N.D.1976), we stated:

"The North Dakota Legislature also defined 'good faith' in § 1–01–21, NDCC, as follows:

" 'Good faith shall consist in an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.'

"With reference to 'good faith,' the Supreme Court of Michigan, in *Detroit Police Officers Ass'n v. City of Detroit,* 391 Mich. 44, 214 N.W.2d 803, 808 (1974), stated:

" 'The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith. The exact meaning of the duty to bargain in good faith has not been rigidly defined in the case law. Rather, the courts look to the overall conduct of a party to determine if it has actively engaged in the bargaining process with an open mind and a sincere desire to reach an agreement. [Citations omitted.] The law does not mandate that the parties ultimately reach agreement, nor does it dictate the substance of the terms on which the parties must bargain. In essence the requirements of good faith bargaining is simply that the parties manifest such an attitude and conduct that will be conducive to reaching an agreement.'

"As used in the statute, we believe to 'negotiate' simply means to present proposals and offer counterproposals, to discuss proposals, to carry on a dialogue, to exchange ideas, all for the purpose of persuading or being persuaded by logic and reasoning. This means that the parties must also be willing to listen and not only talk. It is the art of friendly persuasion. The persuasion can result in an agreement and understanding or a settlement of issues. It does not mean that an agreement must be reached. Neither side is required by law to surrender or abrogate any of its duties and responsibilities. Neither does it mean formal or binding arbitration."

In the instant case the DEA contends that the School Board abrogated its duty to negotiate in good faith.

I. DID THE SCHOOL BOARD FAIL TO NEGOTIATE IN GOOD FAITH WHEN IT ISSUED INDIVIDUAL CONTRACTS PRIOR TO THE CONCLUSION OF THE NEGOTIATION PROCESS?

The DEA contends that the School Board failed to negotiate in good faith when it issued individual contracts prior to the completion of negotiations between the parties on all contract provisions then under consideration. The School Board denies that it acted in bad faith, contending that the School Board fully complied with the negotiation process required by the provisions of Chapter 15–38.1, N.D.C.C., before it commenced the issuance of individual contracts.

█ As held earlier herein, although the provisions of Chapter 15–38.1, N.D.C.C., do not specifically require a school board to continue negotiations after the publication of the Education Factfinding Commission's report, the statutory provisions set forth in Chapter 15–38.1, N.D.C.C., imply the conclusion of a good faith negotiation process by the parties before the school board is permitted to make contractual offers to the teachers in its school system.

█ In the case at bar, the parties had not yet agreed that a negotiating impasse had been reached prior to the commencement of the issuance of individual contracts by the School Board on June 18, 1976. After receiving the report of the Education Factfinding Commission, the parties met only once—on June 8, 1976—at which meeting they stated their acceptance or rejection of the three proposals contained in such report, and conducted no further negotiations. The School Board's assumption that the publication of the Education Factfinding Commission's report concluded the contract negotiation process was in error. Although we find as a matter of law that, as of June 18, 1976, the School Board had failed to complete the negotiation process required by Chapter 15–38.1, N.D.C.C., we find no facts which would indicate that such noncompliance was the result of bad faith on the part of the School Board, rather than as the result of an incorrect interpretation of ambiguous statutory language which failed to specify what, if anything, should occur after the report of the Education Factfinding Commission has been published. We further find that the record supports the trial court's finding that the School Board and the DEA had reached a conclusion of a good faith negotiating process as of October 21, 1976, the date of the order and judgment of the district court. Thus, even though one contract provision under consideration remained unresolved—the extent of medical insurance coverage to be paid for by the School Board—the issuance of individual teaching contracts after October 21, 1976, would not be in violation of the provisions of Chapter 15–38.1, N.D.C.C.

II. DID THE SCHOOL BOARD FAIL TO NEGOTIATE IN GOOD FAITH WHEN IT REFUSED TO CHANGE ITS BARGAINING POSITION AFTER YEAREND AUDITS REVEALED A LARGER THAN ANTICIPATED CASH CARRYOVER FROM THE SCHOOL YEAR 1975–1976?

█ At the contract negotiating session held on April 19, 1976, the School Board announced its intention to limit the increased costs for teachers' salaries, social security payments, and health insurance payments to $158,832.00, or a 10% increase in such expenditures over those of the school year 1975–1976. The DEA contends that because such proposal was prepared at a time when the School Board projected an approximate cash carryover of $200,000.00 instead of the actual cash carryover in excess of $300,000.00 (which sum the School Board learned in late June or early July was available), the School Board should have adjusted its spending limits upward at negotiation sessions held after the School Board was advised of the increased cash carryover figure; and the DEA contends that the School Board's failure so to do constitutes an act of bad faith.

A perusal of the record indicates ample evidence to support the trial court's finding

that the School Board's failure to change its bargaining position after it received the actual cash carryover information was not an act of bad faith. Testimony indicated that the $100,000.00 increase in the cash carryover figure was not significant in relation to the School Board's budget of nearly $4,000,000.00. Further testimony revealed that such funds are considered as contingency funds to meet unexpected expenses or to replace any unforeseen revenue reductions. Finally, the testimony showed that the School Board's offer of April 19, 1976, was not based upon any cash carryover figure projections, but, rather, was the result of the determination of the School Board's negotiating team of what would constitute a substantial and adequate increase in compensation for the teachers in comparison with the total expenditures for the school year 1976–1977. We find no record of the School Board's or its negotiation team having cited inability to finance the DEA's remaining proposal on insurance coverage as their reason for its rejection. We therefore conclude that the finding of the trial court was not clearly erroneous.

### III. DID THE SCHOOL YEAR BOARD FAIL TO NEGOTIATE IN GOOD FAITH WHEN IT HELD SECRET "CONSULTATIONS" AT WHICH MAJOR BARGAINING POSITIONS WERE DISCUSSED AND ADOPTED?

Members of the School Board's negotiating team, as well as other members of the School Board, admitted at the trial of this action that they had held secret "consultations" at which major bargaining positions were discussed and adopted (e. g., the 10% increased spending limit discussed herein). It is the School Board's position that negotiating consultations are by necessity private and are not meant to be included within the scope of North Dakota's open meeting constitutional provision or open meeting law. The DEA contends that any formal consideration of offers or formulation of counteroffers comes within the scope of both our constitutional and statutory open meeting provisions. Whether North Dakota's con-

stitutional or statutory open meeting provisions encompass negotiating consultations as conducted in the instant case is a question of first impression in this State.

Article 92, ¶ 1, of the Amendments to the Constitution of North Dakota provides:

"Unless otherwise provided by law, all meetings of public or governmental bodies, boards, bureaus, commissions, or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be open to the public."

In addition to the foregoing constitutional provision, § 44–04–19, N.D.C.C., provides:

"*Open governmental meetings.*—Except as otherwise specifically provided by law, all meetings of public or governmental bodies, boards, bureaus, commissions or agencies of the state or any political subdivision of the state, or organizations or agencies supported in whole or in part by public funds, or expending public funds, shall be open to the public."

Whether the foregoing constitutional and statutory provisions are applicable to school board-teacher contract negotiations has been in doubt, especially, as in the instant case, when only a committee represented the school board in negotiations. *See* Guy and McDonald *Government in the Sunshine: The Status of Open Meetings and Open Record Laws in North Dakota,* 53 N.D.L.Rev. 51, 63 (1976).

We find that our constitutional and statutory open meeting provisions require that all school board meetings at which teacher contract offers and school board offers and counteroffers are considered shall be open to the public. We further find that our constitutional and statutory open meeting provisions require that all school board-teacher contract negotiating sessions, regardless of negotiating committee composition, shall be open to the public.

Although we have determined that our constitutional and statutory open meeting provisions are applicable to the school board-teacher contract negotiation process [*see Peters v. Bowman Public School Dis-*

trict # 1, 231 N.W.2d 817 (N.D.1975)] and have found a violation of such provisions to have occurred in the instant case—we conclude that it is not necessary to void the negotiations now completed. We also believe that because the violation occurred early in the negotiation process (apparently in late March or early April), and subsequent events mitigated such violation—including the public disclosure which resulted from five months of judicially supervised negotiations—such violation constitutes harmless error in the instant case.

■■■ Without discussing the dissent filed in this case in detail, we make the following observations: the contention that it is bad faith per se to issue contracts to individual teachers prior to the total acceptance of such contracts by the recognized representative organization is without a statutory basis. As was pointed out by this court in *Edgeley Education Association v. Edgeley Public School District*, 231 N.W.2d 826, 834 (N.D.1975):

"Case law on collective bargaining and good faith negotiations arising out of federal or sister state Acts which have been called to our attention are not of much assistance in this instance because of dissimilarities between, or absence of, key provisions in the respective Acts. Neither is case law arising out of labor disputes in the private sector, as distinguished from the public sector, of any significant assistance."

For whatever reason, our Legislature has seen fit to deal with teacher-labor practices differently than either its treatment of private sector employees or other public sector employees. We find no equivalent listing of unfair labor practices as found in the Labor-Management Relations Act, Chapter 34–12, N.D.C.C., which are applicable to the private sector; nor do we find an equivalent procedure to that afforded other public employees in Chapter 34–11, N.D.C.C., providing for the mediation of disputes between public employers and employees—on the contrary, the provisions of the Teachers' Representation and Negotiation Act, Chapter 15–38.1, N.D.C.C., has led this court to observe in *Edgeley Education Association v. Edgeley Public School District, supra* 231 N.W.2d at 833:

". . . that the Legislature intended that the representative for a negotiating unit or the fact-finding commission, as the case may be, resort to persuasion rather than to compulsory or mandatory proceedings."

As we quoted earlier herein, § 15–38.1–12(4), N.D.C.C., provides:

"4. The obligations imposed in this section shall not compel either party to agree to a proposal or to make a concession."

If this court were to require that negotiations continue with the recognized representative organization until a final contract offer is agreed to, such would be a major departure from the express statutory scheme adopted by our Legislature and our prior interpretation of such statutes. (We also note that our previous opinion, in *Edgeley, supra,* was issued nearly two years before the commencement of the present term of the Legislature, allowing that body an opportunity to amend the procedures provided in Chapter 15–38.1, N.D.C.C., if it felt that our interpretation expressed in *Edgeley* was erroneous.) We believe that in order to give significance to the recommendations contained in the report of the Education Factfinding Commission, a reasonable *effort to fully consider it and to* negotiate, pursuant to such report, the unresolved issues must be made subsequent to the publication of such report before a school board may properly issue contracts to individual teachers, unless the Legislature provides otherwise. In this instance, negotiations were conducted under the supervision of the courts. It is hoped that in the future such negotiations will be conducted without the necessity for judicial intervention and supervision.

For the reasons stated herein, the order of the district court is affirmed and the injunction is dissolved.

ERICKSTAD, C. J., and PEDERSON and SAND, JJ., concur.

VOGEL, Justice, dissenting.

I dissent from parts I and III of the majority opinion, and do not reach part II since I believe that the matters covered in parts I and III should dispose of the case.

Anyone reading the majority opinion without reading Chapter 15–38.1, N.D.C.C., would think that the statute provided for something called a "good-faith negotiation process" which could be terminated by the publication of the findings of the Education Fact-finding Commission, that thereafter the representation of teachers by their chosen representative organization and bargaining unit was at an end, and that the School Board became free to negotiate with teachers individually.

None of this is provided by the statute. All of it originates in this court. The statute includes these provisions, unlimited as to time and unqualified as to binding effect:

"15–38.1–01. Purpose.—In order to promote the growth and development of education in North Dakota which is essential to the welfare of its people, it is hereby declared to be the policy of this state to promote the improvement of personnel management and relations between school boards of public school districts and their certified employees by providing a uniform basis for recognizing the right of public school certified employees to join organizations of their own choice and be represented by such organization in their professional and employment relationships with the public school districts.

. . . . .

"15–38.1–08. Right to negotiate.— Representative organizations shall have the right to represent the appropriate negotiating unit in matters of employee relations with the school board. Any teacher, or administrator, shall have the right to present his views directly to the school board.

"15–38.1–09. Subject of negotiations. —The scope of representation shall include matters relating to terms and conditions of employment and employer-em-ployee relations, including, but not limited to salary, hours, and other terms and conditions of employment.

. . . . .

"15–38.1–11. Selection of representative organization.—

"1. . . .

"2. . . .

"3. . . .

"4. . . .

"5. . . .

"6. When a representative organization has been selected, its authority to represent the negotiating unit shall continue for at least one year from the date of such selection.

"15–38.1–12. Good faith negotiations.—

"1. The school board, or its representatives, and the representative organization, selected by the appropriate negotiating unit, or its representatives, shall have the duty to meet at reasonable times at the request of either party and to negotiate in good faith with respect to:

"a. Terms and conditions of employment and employer-employee relations. . . .

. . . . .

In *Edgeley Education Assn. v. Edgeley Public School District No. 3*, 231 N.W.2d 826 (N.D.1975), this court first interpreted Chapter 15–38.1, the statute giving collective-bargaining rights to teachers and school administrators. The present appeal gives us an opportunity to interpret a portion of that statute not dealt with in the *Edgeley* case. The portion we are concerned with now relates to procedures to be followed when negotiations are at an impasse, the impasse procedures of the statute have been followed, and no agreement has resulted.

I dissented in the *Edgeley* case, believing that the majority opinion made much of Chapter 15–38.1 meaningless, and I dissent again in this case, which I believe continues the process.

## VIOLATION OF STATUTE AS TO IMPASSE PROCEDURES

The statutes as to the impasse procedures are Sections 15–38.1–03 to 15–38.1–05 and 15–38.1–13. They provide for the existence of an "education factfinding commission" of three members, appointed by the Governor, the Attorney General, and the Superintendent of Public Instruction. If after negotiations between the school board's negotiators and the negotiators of a recognized bargaining unit of teachers or administrators, an "impasse," as defined in the statute, exists, the parties may either use mediation or they may request the assistance of the Education Fact-finding Commission. If the latter choice is made, the Commission either finds the facts itself or appoints a fact-finder to do so, and ultimately makes formal findings and a "recommendation" which is published if the parties have not agreed within ten days after the recommendation is made.

The Dickinson School Board, in the case before us, took the position that nothing more was required of it in the way of negotiation after the publication, and proceeded to offer individual contracts to the teachers. The contracts were mailed within a period of two to seven days after the publication.

The majority states that the School Board was in error, that the negotiation process was not concluded when the Factfinding Commission's report was made, and " . . . as a matter of law that, as of June 18, 1976, the School Board had failed to complete the negotiation process required by Chapter 15–38.1, N.D.C.C., . . ." So far, so good. But then the majority goes on to say that " . . . we find no facts which would indicate that such noncompliance was the result of bad faith" but " . . . an incorrect interpretation of ambiguous statutory language" and that on October 21, 1976, the date of the district court's order, the parties had "reached a conclusion of a good faith negotiating process . . ."

I disagree. As I pointed out in my dissent in *Edgeley, supra*, 231 N.W.2d at 835,

"One thing that cannot be done in good-faith bargaining is to deal individually with members of bargaining units. This is, under general case law, an unfair labor practice [*Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944)], even in the absence of bad faith [*NLRB v. Pepsi Cola Bottling Co. of Miami*, 449 F.2d 824 (5th Cir. 1971), cert. denied 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683]."

We are not here interpreting a statute in a vacuum. We must assume that the North Dakota Legislature, in creating a system of collective bargaining for teachers, did so with knowledge of what had gone before in the field of labor relations and public employees, and legislated accordingly. Once there is a duty to bargain in good faith, as there is under Chapter 15–38.1, that duty continues regardless of whether or not agreement is reached. The duty to bargain collectively exists even after strikes are commenced (where strikes are permitted). *Amalgamated Assn. of Street, Electric Ry. & Motor Coach Employees of America, Division 998 v. Wisconsin Employment Relations Board*, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364, 22 A.L.R.2d 874 (1951).

It necessarily follows that the School Board was, as a matter of law, acting in bad faith from the time it issued individual contracts on June 18, and acted in bad faith in refusing to continue to bargain with the bargaining unit. The School Board never had, and does not now have, under the provisions of Chapter 15–38.1, the right to bargain individually with individual teachers. The majority apparently reads between the lines of the statute and finds a provision there which is invisible to me.

## VIOLATION OF OPEN–MEETINGS STATUTE AND CONSTITUTIONAL PROVISION

The majority holds that the secret meetings of the School Board and its negotiating team violated the open-meetings statute, Section 44–04–19, N.D.C.C., and Article 92 of the Amendments to the Constitution of

North Dakota. But then the majority holds that the violation is "harmless error"! I cannot be so cavalier toward the mandatory provisions of Constitution and statute. How can we say that the violation is harmless when the general public (for whose benefit the open-meetings law and constitutional provision were adopted) were left in the dark during the negotiating process?

The majority says that the violation of the Constitution and the open-meetings statute occurred early in the negotiation process and that "subsequent events mitigated such violation—including the public disclosure which resulted from five months of judicially supervised negotiations— . . . ." I fail to find in the record any indication that the practice of the School Board was changed one iota during the "judicially supervised negotiations." The School Board's brief says only that,

> "Final discussion and action on all matters which affected the contract negotiations here were taken publicly and upon the record. This would seem to be more than ample compliance with Section 44–04–19 if it is deemed applicable and a reasonable construction in the public interest is placed upon it."

The majority has found that the School Board violated the statute and the Constitution. The School Board says only that the Constitution and the statute should be interpreted so as to allow it to do what it has done. The majority says—and I agree—that the Constitution and the statute cannot be so interpreted. Not even the School Board claims that it complied with the law as we all agree it should be interpreted. Since the violation is obvious and continuous, even during the "judicially supervised negotiations," I find no basis for holding the violation to be "harmless."

The majority opinion twice quotes subsection 4 of Section 15–38.1–12, N.D.C.C., which provides:

> "The obligations imposed in this section shall not compel either party to agree to a proposal or to make a concession."

This dissent, of course, nowhere suggests that either party is obligated to agree with the other. I only insist that each party is obligated to bargain in good faith with the other, that this duty is a continuing one which is not terminated by the publication of the recommendations of the Fact-finding Commission, that such duty is breached by dealing individually with individual teachers represented by a representative organization of their own choosing, and that a continuing violation of the open-meetings constitutional provision and statute is not harmless error.

I would continue the injunction and require the parties to continue negotiating, and would hold that in the meantime the teachers in the Dickinson school system are teaching without valid contracts, although they are entitled to the wages and working conditions under which they have been teaching without a contract since the beginning of the school year. I believe they may also be entitled to additional compensation and other working conditions, depending upon the outcome of negotiations which should continue and upon the outcome of possible actions by teachers or their representative organization for damages for violation of their statutory and constitutional rights.